Hawkins, J.,
delivered the opinion of the Court.
Prior to the ratification of the amendment of the Constitution of this State, on the 22d day of February, 1865, by which slavery was abolished, the defendant was a slave. Subsequent to the adoption of said amendment, he was indicted, in the Circuit Court of Maury County, for the crime of rape upon a free white woman; and at the January Term, 1866, of said Court, was arraigned, plead not guilty, and tried and convicted of the offense. The offense was committed in the month of March, 1864, and the jury trying the cause, in addition to finding the defendant guilty of the crime charged in the indictment, also .found that the defendant was a slave at the time of the commission of the offense; thereupon, upon motion, his Honor, the Circuit Judge, arrested- the judgment upon the verdict, and from this action of the Court, the Attorney General has appealed to this Court.
The first and most important question presented for our consideration is this: Can the defendant, since his status has been changed from that of a slave to that of a free man, be punished for the crime of rape upon a free white female, whilst he was a slave; or, in other words, does the amendment to the Constitution, abolishing slavery in this State, operate as a pardon of the offense, so as to entitle the defendant to a discharge?
The question is one fraught with interest, and is of *187 vital importance to all classes of our population, because of the fact, that recently four millions of human beings, who, until recently, have been held as slaves in this country, and as such, were capable of committing crime, and amenable to the criminal laws of the country, have been made freemen, by the abolition of slavery. So far as we are advised, this precise question has never been judicially determined; consequently, in its investigation, we can derive no aid from the light of precedent, but must be guided alone by the light of reason, in our- efforts to discover the pathway pointed out by principles, which, as we believe, are, by analogy, applicable to the case.
At the threshold of this investigation, we think we may assume the general rule of law to be, that, to authorize the punishment of the accused, it must not only appear, that, at the time the act was committed, it was declared unlawful, its punishment declared and fixed by law, and that there was a. tribunal clothed with power and authority to try the offender, pronounce judgment, and enforce the penalty incurred by a violation of the law; but such laws must also be valid and subsisting at the time of the trial, or no judgment can be pronounced, or punishment inflicted; and if either has failed, or is wanting at the time of the trial, such failure operates as a pardon of the offender, and entitles him to a discharge. The inquiry then becomes important, what were the provisions of the law, as it existed at the time of the commission of this offense, to-wit: in the month of March, 1864.
By reference to the Code, sec. 4610, we find rape is *188 defined to be the unlawful carnal knowledge of a woman, forcibly and against her will. Sec. 4611 declares that “whoever is convicted of the rape of any female of the age of ten years or upwards, shall undergo imprisonment in the Penitentiary, not less than ten, nor more than twenty-one years.” By sec. 2625, it is provided, among other things, that rape, when committed by a slave upon a free white female, shall be capital, and punished with death, by hanging. Sec. 2629 provides “the Circuit and Criminal Courts shall have exclusive jurisdiction of all capital offenses committed by slaves;” and sec, 2630 provides, that all other offenses committed by slaves, may be tried by a single Justice of the Peace. Sec. 4967 declares, “the Circuit and Criminal Courts have original jurisdiction of all criminal matters not exclusively confined by law in some other tribunal.” Sec. 2725 declares that “all offenses made capital by this Code when committed by slaves, shall be capital when committed by free persons of color;” and sec. 2632 provides that the trial of a slave for a capital offense, shall be conducted in the same manner as that of a free person. Such were the provisions of the law, as it existed at the time of the commission of this offense, so far as they are deemed applicable to the question now before the Court.
It is clear, that, at the time the act was committed, the law declared rape to be a crime, whether committed by a white man, free man of color, or a slave, fixed its punishment, and conferred jurisdiction upon the Circuit and Criminal Courts to try the offender, pronounce judgment, and inflict the punishment. The *189 crime committed by a free man of color, or a slave, is declared capital, and, upon conviction, the offender is punishable with death by hangipg; but if committed by a white man, it is not capital, and is only punishable by imprisonment in the Penitentiary. The only difference in the case, where the crime is committed by a white man, and the case where it is committed by a free man of color, or a slave, is, as to the degree of crime, and consequent degree of punishment. The jurisdiction of the Circuit or Criminal Courts to try and punish the offender, is full and complete. The trial of a slave, or free man of color, charged with this or any other capital offense, must be, in all respects, conducted in the same manner as the trial of a free white man charged with a capital crime. Then, as to the degree of the crime, the manner and incidents of the trial, the tribunal having jurisdiction to try and punish the offender, and the extent of the punishment to be inflicted, it can make no difference to the defendant, whether, at the time of committing the crime, he was a free man of color, or a slave; inasmuch as prior to the abolition of slavery, free men of color and slaves were alike subject to indictment, to be put upon trial, and, upon conviction, were also subject to the same punishment, the same tribunal having jurisdiction for that purpose. Eot only were they alike subject to indictment, and to be tried in the same manner, by the same tribunal, and, upon conviction, to the same punishment; but none of these were made in any manner to depend upon the status of the defendant, either at *190 the time of the commission, of the crime, or at the time of pronouncing the judgment.
Unaffected by the amendment of the Constitution before referred to, the law now is precisely the same, as to the crime with which the defendant is charged, his trial and punishment, as it was when the crime was committed. Now, let us see to what extent, laws existing prior to the time said amendment became a part of the Constitution, have been abrogated or repealed thereby. Prior to the adoption of that amendment, persons of color were held as slaves in this State, and the right so to hold and exercise dominion and control over them as property, was recognized by the Constitution and laws of the State; but by sec. 1, of article 1, of said amendment, it is declared that “slavery and involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, are hereby forever abolished and prohibited throughout the State.”
All laws existing prior to the adoption of that amendment, inconsistent with its provisions or manifest purposes, are, by implication, repealed. The manifest purpose of the amendment, as clearly appears from its language, was, not only to abolish slavery as an existing institution, but to interdict its establishment in the future, and to repeal all laws recognizing the right of property in man, or recognizing the right of one man to exercise dom^don over another, as property, and to secure to the slave all the rights secured to free persons of color. By virtue of that amendment, the master lost dominion ovér his fellow, who had been his slave; the *191 bondsman was loosed from bis chains, and he became a freeman; and now, because of his caste, belongs to that class of persons denominated free persons of color, and is entitled, under the law, to all the rights and privileges of such. Thus far, but no farther, was the status of the defendant changed by the amendment of the Constitution; all laws, and such only as declared the existence of slavery, or recognized the right of property in man, or the right to exercise dominion over him as property, or withheld from slaves the rights and privileges of free persons of color, being inconsistent with the provisions and purposes of said amendment, are, hy implication, repealed. Thus far, hut no farther, can it be properly said, in a legal sense, the laws existing prior to the adoption of said amendment, are repealed thereby. These are not of a criminal nature, as either declaring offenses by slaves, or providing for their punishment; but are purely laws of property. Many laws, however, which were criminal" in their nature — such as declared certain acts, when committed by slaves, to be offenses which were not offenses, when committed hy any other class, and provided certain and peculiar modes for the punishment of the offenders, as slaves, as well as all laws, which may properly be denominated as police regulations, for the government of slaves, although they may not, in strictness, be said to have been repealed by said amendment — are, nevertheless, rendered inoperative, and are as dead letters upon our Statute boots, there being now no slaves to commit offenses, or to try or punish. The jurisdiction given to the Circuit and Criminal Courts,, to try and punish *192 slaves, is limited to a certain class of crimes, whilst the jurisdiction to try and punish them for all other, and by far the most numerous class of crimes, is given to Justices of the Peace; but this latter jurisdiction can no longer be exercised, even though the offender was a slave at the time of the act; because he has since that time, become a free man; and free men cannot be tried and punished under a law, applicable and intended alone for the trial and punishment of slaves, as a class. Before they became freemen, and while they were slaves, the Circuit and Criminal Courts had no jurisdiction to try and punish them for the offenses— jurisdiction of which was given exclusively to Justices of the Peace. The jurisdiction to try and punish an offender, cannot be transferred from one tribunal to another, simply because of a change in the status of the offender. The tribunal having the jurisdiction at the time of committing the offense, had lost it. It, therefore, follows that, in all such cases, the amendment to the Constitntion operates as a pardon, and entitles the party to a discharge, because of a total failure of jurisdiction to try and pronounce judgment against the offender.
But how is it with reference to this case P
The law, as it existed at the time of the commission of the offense with which the defendant is charged, and of which he has been convicted, declared the act to be a crime, whether perpetrated by a white man, a free man of color, or a slave. Therefore, it is not an offense only when committed by a slave. Farther: The law, as it existed at the time of the commission *193 of the offense, conferred upon the Circuit and Criminal Courts, jurisdiction to try and punish persons guilty of this offense, whether they were white men, free persons of color, or slaves. Therefore, the jurisdiction of the Circuit Court to try and punish the defendant, is not because of, or dependant upon, the fact that he is a slave.
The status of the defendant is changed — nothing else. The jurisdiction of the Circuit Court to try and punish the defendant for this crime, before the adoption of the amendment abolishing slavery, had he been then a free man of color, was as full and complete as it is now to try and punish a free man of color, for the same crime, committed since the abolition of slavery; and the jurisdiction to try and punish the defendant, even were he still a slave, is precisely the same as to try and punish a free man of color, or a white man, for the same offense, subject only to the distinction between the degrees of crimes, and extent of the punishment before mentioned. We are, therefore, wholly unable to [discover, upon what principle the Circuit Court is ousted of its jurisdiction to try and punish the defendant, whether he was a free ' man of color or a slave, by the mere fact that, at the time the offense was committed, he was a slave, and has since become a free man of color.
Neither the law declaring the offense of which the defendant stands convicted, and affixing the punishment, or the law conferring upon the Circuit Court, *194 the jurisdiction to try him upon the charge, and to pronounce judgment upon hi3 conviction, are inconsistent or in conflict with either the provisions or purposes of said constitutional amendment; and, therefore, they are neither repealed, abrogated, suspended or rendered inoperative thereby. We are, therefore, of the opinion, that the fact that the defendant was a slave at the time of the commission of- the offense, and has since been emancipated, being now a free man of color, constitutes no ground for arresting the judgment upon the verdict of the jury...
This' seems to have been the ground upon which His Honor, the Circuit Judge, arrested the judgment; and the questions involved have been argued by counsel with great force and ability.
But other questions arise upon the record, which we cannot overlook. At the May Term, 1865, of the Circuit Court for the County of Maury, as appears from the record, the grand jurors returned into Court a bill of indictment against the defendant, for rape, indorsed: “A true bill, George Lipscomb, Foreman of the grand jury,” which was, by order of the Court, spread upon the minutes of the Court, and is signed, “Archilaus M. Hughes, Attorney General for the 11th Judicial Circuit.”
This indictment contains two counts. The first charges “That Charles, a negro, and then the slave of John Davidson, on the first day of July, eighteen hundred and sixty-four, in said County of Maury, fel-loniously did assault one Louisa Watson, a free white *195 woman, and then and there did, unlawfully and felo-niously, carnally know her, the said Louisa Watson. The second count is substantially a copy of the first, except that it charges “That Charles Davidson, a negro, on,” etc. To this indictment, the defendant plead, “Not guilty,” on the same day it was returned into Court. Afterwards, and at the succeeding August Term, 1865, of said Court, the following entry appears on the record:
“State of Tennessee vs. Chaeles Davidson. — Indictment for Rape: — This day came Robert L. Ca-ruthers, Attorney General pro tern., and moved the Court to withdraw the indictment', in this cause, for the purpose of sending up before the grand jury, an additional count to said indictment; - and the Court ordered the same to he done.”
Then follows in the record, what appears to he an original indictment, in which it is charged, “That Charles Davidson, a free man of color, on the said first day of July, 1864, etc.,” charging the crime of rape, substantially, as the same is charged in the indictment, found at the preceding Term of the Court. This indictment is signed, “Robert L. Caruthers, Attorney General pro tem.,” and is indorsed, “additional count — State vs. Charles Davidson, Indictment for Rape. Robert Jamison, prosecutor.” It is also indorsed, “A true hill — Nathaniel T. Moore, Foreman of the grand jury;” and on the same day, to-wit, ,4th of Sept., the following entry appears in said cause:
“This day came, as well the Attorney General as the defendants, and the additional count in this in *196 dictment being read to, and in his hearing, he pleads thereto, that he is not guilty”
At the following January Term, 1866, of said Court, the defendant was arraigned and tried upon both indictments, the Court regarding them as several counts in the same indictment. Upon the trial of the case, the Circuit Judge instructed the jury, that upon the second count, which charges the offense to have been committed by a negro, no conviction could be had, consequently the conviction was upon the first, or what is denominated in the charge of the Court, the third count in the indictment; and the question now is, can the conviction be now sustained as to the indictment found at the May Term, 1865. We may briefly state: 1st, The record wholly fails to set out the venire facias, or to show that one was returned into Court at that Term. 2d, It fails to show that any grand jury was elected, impanneled, sworn or charged at that time, or that any one was appointed foreman thereof. 3d, It fails to show there was a prosecutor, or that any was marked upon the indictment.
But, it is. insisted these defects are all cured, by the provisions of sec, 5242 of the Code. We do not think so. By that section it is declared, that “when a person indicted or tried for a criminal offense is arraigned before- a Court having jurisdiction of the matter, and pleads not guilty, and is tried upon the merits and convicted, he shall not be entitled to a new trial, or to an arrest of judgment, or to a reversal of the judgment for any of the following causes;” and *197 nine different canses are there stated. We cannot give to a Statute of this character a greater latitude of construction than is warranted by the plain and obvious import of the words of the Statute. Did the Legislature mean thereby that a pérson who had been tried upon the merits of his case, upon a plea of not guilty, and convicted, should not. be entitled to a new trial, or arrest of judgment, because of the existence of all the causes enumerated in that section? We cannot believe the Legislature could have intended, or desired, to effect a change so radical in the criminal practice of the State, or that the language employed in that section will warrant any such construction. The language is, “He shall not be entitled,” etc., “for any of the following causes,” and must be construed as though it read, “for any one of the following causes.” This we believe to be the obvious meaning of the language employed, and, consequently, if more than one of the causes mentioned, exists, and such causes would, but for the provisions of that section, entitle the party to a new trial, or to an arrest of judgment, or to a reversal of the judgment, such party is entitled to the relief, notwithstanding the provisions of that section. But, it will be observed, all the causes for an arrest of the judgment in this case, are not even enumerated in that section. The cause stated in the 6 th paragraph, is, that “the Clerk omitted to embody in the record ¡the venire facias. It had already been holden, by this Court, in the case of Conner vs. The State, 4th Ter., 187, 140, 141, citing Cornwell vs. The State, M. & Ter., 147, and McClure vs. The State, 1st *198 Ter.; 206, that it was not necessary that the venire facias he spread upon the minutes of the Court. It was enough if the record showed the return of the venire facias, and the selections of the grand jury, neither of which is shown by this record. Finally, the record shows that the indictment found at the May Term, 1865, was, at a subsequent term, withdrawn; and it wholly fails to show that it was ever again returned into Court, by the grand jury, or otherwise. An indictment may be withdrawn by leave of. the Court, and recommitted to the grand jury, by which it has been found, and returned into Court; but when returned into Court again, the record must show the fact, and the failure to do so, is such a defect as will not be cured by the provisions of the 7th clause of section, 5242, of the Code before referred to; especially if it was indorsed “a true bill,” before it was withdrawn, and at a former term of the Court. That indorsement is, by the clause before mentioned, after a trial upon the merits, made evidence of the fact that the indictment had once been returned into Court by the grand jury; but it cannot be regarded as evidence that it has been properly returned the second time. But we are not aware of any authority for withdrawing an indictment at a term of the Court subsequent to the term at which it has been found, and recommitting it to a different grand jury for amendment, by the addition of new counts, or otherwise; and believe none such can be found.
The bill of indictment, entitled of the August Term, 1865, cannot be considered as an amendment of, or ad *199 ditional count to the indictment found at the preceding term, but is a new bill, and must'have been prepared, acted upon and returned into Court,- with all the formalities required by law. How is this? " The record- fails to show that any venire facias was returned into Court, or that any grand jury was elected, impanneled, sworn or charged, at that term of the Court. It wholly fails to show the appointment of any Foreman of the grand jury, or that said indictment was entered into Court, by the grand jury or any one else, or was ever entered upon the minutes of the Court. It fails to show the appointment of the Attorney General pro tem., or the existence of such facts as authorized the appointment. The Act of 1852, which provided that the failure of the record to show that the person who signs the indictment as Attorney General pro' tem., was appointed, was not error, seems not to have been transferred to the Code, but in lieu, the eighth clause of said section 5242, was adopted; and if this were the only one of the defects, or omissions, enumerated in that section, to be found in this record, which, but for that section, would have entitled the defendant to an arrest of the judgment in this cause, he would not be entitled to an arrest of the judgment; but, as we have already shown, that section was not intended to withhold the relief in cases where all or more than one of the causes enumerated therein, existed. In the case of Isham vs. The State, 1st Sneed, 114, Judge Ca-ruthers, in declaring the opinion of the Court, said: “It must be presumed that the Court would not permit any one to enter upon and discharge the im *200 portant functions of this officer without the existence of some necessity, and regular appointment.” But in that case, the indictment was preferred by the regular Attorney General, and an Attorney General pro tem., merely appeared in the prosecution of the case. And it must also be remembered, that case was decided under the Act of 1852, which declared the* failure of the record to show the appointment of the pro tem. was not error. But in this case, we scarcely have room for any such presumption, for on the same day upon which the Attorney General pro tem. asked leave to withdraw the indictment, the record shows that the Attorney General appeared in the cause. But it may be said, we must presume the record is in error, and in fact it was the Attorney General pro tem. To this we answer, we can only ascertain that there was in fact, an Attorney General pro tem., by presumption —and when presumptions become dangerous, they cease to arise. No judgment can be pronounced upon either indictment. If the question to be determined by us was the right of the defendant to a new trial, upon the facts of the case as presented in this record, we would feel constrained to deny the application and pronounce [the sentence of the law; but were we to pronounce judgment upon this verdict, in the language of Judge Turley, in the case of Hite vs. The State, 9th Ter., “we would feel that we were destroying the great and fixed principles of criminal practice, ‘so necessary to the protection of the liberty and life of the citizen.”
The judgment of the Circuit Court will be affirmed; *201 and the prisoner will be remanded to the jail of Maury County, to be kept in custody until he can be again indicted for the offense, or discharged by the Circuit Court of said county.
In the view we have taken of this case, it is not now necessary to determine whether or not the description of the defendant, in either Court or indictment, is sufficiently correct to authorize us to pronounce judgment upon the verdict; but we think, perhaps, the better practice would be, to state, in the indictment, his present status, as well as the status he occupied at the time the offense is alleged - to have been committed.